# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

IN RE: MICHAEL J. SULLIVAN, TRAFFIC COURT JUDGE, PHILADELPHIA COUNTY

PETITION OF: MICHAEL J. SULLIVAN

: No. 128 EM 2014
:
:
: Application for Relief from the Order of the
: Supreme Court at No. 398 Judicial
: Administration Docket, dated February 1,
: 2013.
:
:
:

## DISSENTING STATEMENT

**MR. CHIEF JUSTICE CASTILLE**                    **FILED: November 18, 2014**

I respectfully dissent.

Petitioner Michael J. Sullivan was administrative judge of the Philadelphia Traffic Court bench during a time when "fixing" tickets for those politically and socially connected was rampant. See U.S. v. Sullivan, 2013 WL 3305217 (E.D. Pa. 2013). On January 29, 2013, petitioner -- along with eight other judges elected, or assigned, to Traffic Court -- was indicted in federal court on felony charges of wire fraud, 18 U.S.C. § 1343, mail fraud, 18 U.S.C. § 1341, and conspiracy to commit wire and mail fraud, 18 U.S.C. § 1349, premised upon allegations of corruption on the bench of the Philadelphia Traffic Court. This Court suspended petitioner without pay by Order dated February 1, 2013. Seven months later, the Court of Judicial Discipline (the "CJD") belatedly got around to suspending petitioner, also without pay. Petitioner went to trial in federal court this past summer, with others of his ticket-fixing comrades, and he, and some others, were acquitted of the felony charges.

The common defense at trial was apparently that, so long as a Traffic Court judge did not receive a financial *quid pro quo* to fix a ticket, there was reasonable doubt

whether he violated federal law. The federal jury apparently accepted the defense, succumbing to what I have elsewhere described as the jaundiced view of Philadelphia being happy and contented, wallowing in corruption.

Four of petitioner's co-defendants likewise were acquitted of all charges, while four others, who were also charged with making false statements to the grand jury or the FBI, 18 U.S.C. §§ 1623, 1001, were found guilty by a jury of these charges. The Honorable Lawrence F. Stengel of the U.S. District Court for the Eastern District of Pennsylvania, before whom the matter was tried to a jury verdict, recently offered the following general description of the case in addressing the post-verdict motion of petitioner's convicted co-defendants:

> During the eight week trial the government presented in excess of 60 witnesses and many exhibits. Witnesses included Traffic Court employees, judicial assistants (known as "personals") for each of the defendant judges, persons who were issued traffic tickets and persons who requested special treatment or "consideration" from the judges or their assistants. The evidence at trial demonstrated very clearly that defendants were influenced by "extrajudicial communications" when reaching their decisions on select tickets. In short, they and their colleagues were "fixing tickets."

> The extrajudicial communications were ferried about the courthouse by the defendants' personal assistants and other court house staff. These employees testified that there was no specific term used to identify the requests. The employees would speak in code, asking for "consideration," requesting another judge to "take a look at a ticket," or simply telling a colleague or staffer, "I have a name for you." Regardless of the terms, the evidence was clear: the defendants were routinely granting favorable dispositions to well-connected ticket-holders who knew a Traffic Court judge or an employee.

U.S. v. Lowry et al., 2014 WL 5795575 at *1 (E.D. Pa. November 6, 2014) (opinion on post-verdict motions for judgment of acquittal or for a new trial).

Later in his opinion, responding to the specific post-verdict motions before him, Judge Stengel adverted to two of the instances where Sullivan was involved in fixing tickets: petitioner adjudicated as "not guilty" the family member of one Traffic Court judge and the acquaintance of another.

> Court employees testified that [former Judge Michael] Lowry both accepted requests for consideration and made such requests to other judges. Perhaps the strongest evidence was [the] testimony [of Lowry's judicial assistant] that Mr. Lowry requested consideration for his nephew, Francis Lowry. Francis Lowry testified that he did not go to court to defend his traffic citation. Nonetheless, the government established that Former [sic] Traffic Court Judge Michael Sullivan found Francis Lowry not guilty. The jury could reasonably infer from the evidence that Mr. Lowry was expecting a favorable disposition for his nephew and he took steps to get that disposition.
>
> *     *     *     *
>
> With respect to count 73, evidence regarding Natisha Mathis's ticket established that [former Judge Willie] Singletary arranged or facilitated preferential treatment with a matter in Traffic Court. Ms. Mathis received three moving violations over two traffic stops. Ms. Mathis knew Mr. Singletary through a mutual friend, Malcom Lewis. Ms. Mathis called Mr. Singletary for help on her tickets. After the second traffic stop, she met with Mr. Singletary in his chambers at Traffic Court and gave him the tickets. Michael Sullivan adjudicated the first ticket not guilty, and Mr. Lowry dismissed the two tickets issued during the second traffic stop. The jury could very reasonably infer from this evidence that Mr. Singletary sent requests for consideration to Mr. Sullivan and Mr. Lowry for Ms. Mathis's tickets.

Id. at ** 5, 10.

In the meantime, petitioner immediately responded to his acquittal by petitioning this Court to vacate -- but only in part -- our Order of suspension. Specifically, he asks the Court: (1) to reinstate his pay as Judge of the Philadelphia Traffic Court; and (2) to order back-pay from the date of his suspension. Notably, petitioner does not request reinstatement to his position on the bench or resumption of his judicial duties. Petitioner adds that he "does not contest the Court's ongoing administrative authority to regulate judicial assignments." Essentially, petitioner requests to be reimbursed for his non-work for the past year and one-half and to be paid for the next three years, also without working.[1] Petitioner adds that he will seek separate relief from the order of the CJD suspending him without pay. Petitioner apparently has yet to file an application to vacate the CJD's order and, as a result, that order remains in effect. Perhaps, the CJD is waiting for this Court to act.

I read the Court's action today as essentially deferring to the CJD. I respectfully dissent because I do not believe that the federal acquittal puts an end to the inquiry

---

[1]     Petitioner was elected to the Philadelphia Traffic Court in November 2005, taking office in January 2006, and was retained as a judge of the same court in November 2011. Petitioner's term ends on December 31, 2017. From April to December 2011, petitioner served as administrative judge.

Petitioner mistakenly states in his application for relief that his term ends in January 2016. Under current law, Philadelphia Traffic Court judges are elected to six year terms. PA. CONST. art. V, § 15(a)). In 2013, the General Assembly commenced the process of amending the Pennsylvania Constitution to eliminate references to the Philadelphia Traffic Court. See PA. CONST. art. XI, § 1. In addition, the General Assembly has already amended Title 42 to provide that the composition of the Philadelphia Traffic Court is limited to "two judges: (1) who are serving on the court on the effective date of this subsection; and (2) whose terms expire on December 31, 2017." 42 Pa.C.S. § 1321. Section 1321 thus specifically addresses petitioner's tenure, in addition to that of Traffic Court Judge Christine Solomon; they will be the last two traffic court judges, after which the ticket-fixing affair will be at an end.

involving misconduct, either as an administrative matter or as a disciplinary matter, and also because I believe awarding petitioner a three-year unpaid leave of absence is intolerable.[2]

There is no criminal statute, state or federal, that says: "It shall be a felony (or misdemeanor) for a judicial officer to fix a case or to attempt to influence the outcome of a case." In an ideal world, such a statute would not be necessary; but, as the experience with Philadelphia Traffic Court confirms, this is not an ideal world, and perhaps such a statute is overdue. Regardless of the criminal law, there is a Code of Judicial Conduct, and fixing cases, or improperly seeking to influence cases *ex parte*, implicates the core of the judicial function and the fitness of a judge to serve on the bench.

In its opinion in support of its order suspending petitioner, the CJD cited numerous references in the federal indictment detailing wrongdoing by petitioner in relation to individual traffic citations, in addition to petitioner's unique position as this Court's appointed administrative judge to influence the Philadelphia Traffic Court culture. Specifically, the CJD contrasted petitioner's alleged actions with those of Magisterial District Judge Mark A. Bruno, a Delaware County magisterial district judge occasionally designated to sit in Traffic Court, who also had been suspended by the CJD with pay in the aftermath of his indictment for similar misconduct on the Philadelphia Traffic Court bench. The CJD noted that, "Sullivan both received requests

---

[2] This expression also serves the purpose, identified by Mr. Justice Baer in his concurrence in the recent Bruno matter, of engaging in a dialogue with the Judicial Conduct Board and the CJD regarding whether disciplinary charges are being pursued against petitioner, as a prerequisite to a determination of whether the involvement of this Court is necessary. See In re Bruno, --- A.3d ----, ---, 2014 WL 4915942 at *51 (Pa. 2014) (Baer, J., concurring).

for 'consideration' from other judges' personals and made requests for 'consideration' to other judges, as communicated through the personals and court staff"; "[a]llegations of specific examples of Sullivan's conduct are spread throughout the [i]ndictment." Moreover, the CJD concluded that, "as the Board aptly note[d], Judge Sullivan was Administrative Judge of the Traffic Court for a period of time in 2011 (April to December) and thus 'was in a unique position to put a stop to the errant behavior of its judges'; but he did no such thing." The CJD found that, in Sullivan's case, the conduct alleged "is inherently disdainful of the laws he was elected to enforce, contemptuous of the law in general, took place over and over again, and became a way of life. And the law became a laughing-stock." The CJD held that "only an order of interim suspension which removes [petitioner] from the public payroll has any prospect of ameliorating the potential harm to the public's confidence in the judicial system which has been caused by [petitioner]'s alleged conduct which has led to the pending charges against him." CJD's Opinion, 8/9/2013, at 5-8.

The CJD's assessment of petitioner's culpability and opprobrium of his conduct on the bench notwithstanding, as noted, on July 23, 2014, petitioner was acquitted by a jury of all federal charges relating to his misconduct on the Philadelphia Traffic Court bench. On August 14, 2014, the district court entered judgment on the verdict.[3]

---

[3] Of the Traffic Court Judges whose circumstances were addressed by both the CJD and the Supreme Court, *i.e.*, Judges Bruno, Sullivan, and Michael Lowry, the CJD correctly predicted the outcome of the criminal trials in only one case -- Bruno. All three jurists were suspended without pay by this Court. Bruno was suspended **with** pay by the CJD and subsequently acquitted. Lowry was suspended **with** pay by the CJD and convicted of perjury. Sullivan was suspended **without** pay by the CJD but acquitted of all federal charges. This illustrates that the CJD's approach of deconstructing the criminal indictment as a basis for making an interim suspension decision is at best a guessing game and at worst a collateral attack on the criminal proceedings premised on questionable expertise involving, in these cases, federal criminal law. I remain of the view that the approach I counseled in my special concurrence in Bruno, --- A.3d at ----, (continued…)

On September 3, 2014, petitioner filed the miscellaneous petition now before the Court, requesting partial *vacatur* of the Court's Order of February 1, 2013, an award of a lump sum in back-pay, and reinstatement of pay going forward, even as he continues to do no work. The Court today goes further and vacates the February 1, 2013, Order in its entirety, washing its hands of the matter.

Respectfully, in my view, the Court's preferred disposition is premature. Different considerations pertain in petitioner's case than in <u>Bruno</u>, where reinstatement was authorized (which is not to say that Judge Bruno should not still be subject to some form of discipline for ticket-fixing in the ordinary course). Petitioner -- like Bruno -- was acquitted of the criminal charges, yet -- unlike in the case of Bruno -- the CJD did not act either *sua sponte* or immediately to vacate the order of suspension without pay in petitioner's case. As a practical matter, the present action is unnecessary because, even after the Court's *per curiam* action, the CJD's order remains in effect. Any advantage petitioner may hope to gain is one of perception -- and a potent one at that -- that this Court is content to lay the matter to rest.

I write to explain why, in my view, the question of the proper consequence for petitioner's judicial misconduct is far from over. The conclusion of the federal indictment in an acquittal does not close the chapter on any duty of the Judicial Conduct Board to investigate, or of the CJD to adjudicate, disciplinary infractions implicated by the conduct giving rise to the federal indictment against petitioner. Because disciplinary proceedings are confidential in their initial stages, it may be that the CJD's order

_____

(…continued)
2014 WL 4915942 at *42-47 (Castille, C.J., specially concurring), is the preferable approach to achieve the dual purposes of uniformity and, more importantly, of protecting the integrity and probity of the judicial process in Pennsylvania, which the authority to suspend a jurist during the pendency of criminal or disciplinary charges vindicates.

remains in effect because a disciplinary investigation or disciplinary charges are presently pending against petitioner; I certainly hope that is the case.

Two other considerations are also relevant: the severity of the allegations against petitioner, and the nature of the relief he seeks in his present application. Bruno involved fixing one ticket; petitioner, however, was administrative judge of the Philadelphia Traffic Court and, as the CJD so forcefully articulated in its earlier opinion, petitioner oversaw the culture of corruption upon which the federal felony charges were premised. Notably, the defense in the federal trial was not predicated upon denying participation in the widespread ticket-fixing culture, or denying that petitioner knew, oversaw, or failed to report on the corruption pandemic at the Philadelphia Traffic Court. And, the federal acquittal certainly does not mean that petitioner and his comrades in the Traffic Court scheme did not seek to fix tickets. Indeed, commenting on the evidence introduced at trial with respect to one co-defendant, the district court offered the following insight:

> [Former Judge] Mulgrew also attacks the consistency of the verdict. Since the jury acquitted Mr. Mulgrew of the underlying fraud and conspiracy charges, he asserts that there was no evidence that his statements were false. This argument assumes that the jury acquitted Mr. Mulgrew of fraud because the jury did not believe that he engaged in the consideration process. To the contrary, the jury might have decided that the government's proof that Mr. Mulgrew made and honored requests for consideration was credible, but that he lacked the requisite intent to deprive the City [of Philadelphia] and [the] Commonwealth [of Pennsylvania] of money or property. . . . We do not know exactly what evidence the jury considered important.

Lowry, 2014 WL 5795575 at *6 (citation omitted).

Petitioner now seeks back pay, and to be paid going forward -- even while not performing any judicial duties. Again, his acquittal of felony charges does not mean that Sullivan did not commit the underlying **misconduct on the bench**, and the temerity of the instant request: "award me back pay and pay me going forward while I do nothing" corroborates, in my mind at least, that there is a serious question of whether he is fit to be a judge.

Under these circumstances, my preference is to allow the Judicial Conduct Board and the CJD to act first, either to vacate the interim suspension order dated August 9, 2013, or to pursue disciplinary action against petitioner. In my view, it is consistent with the reasoning of In re Bruno, supra, to permit petitioner and the Board the opportunity to litigate before the CJD in the first instance any questions of whether petitioner is entitled to reinstatement of pay, resumption of judicial duties, and back-pay. The Court's decision to act upon petitioner's application without the benefit of the Board's perspective is, in my respectful view, premature.